FILED
**United States Court of Appeals**
**Tenth Circuit**

**May 29, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

PerUNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

BOLANLE ODEYALE, a/k/a Bella,

    Defendant - Appellant.

No. 24-4042
(D.C. No. 2:24-CR-00042-HCN-CMR-1)
(D. Utah)

_____

### ORDER AND JUDGMENT[*]
_____

Before **HOLMES**, Chief Judge, **MORITZ**, and **FEDERICO**, Circuit Judges.
_____

Bolanle Odeyale was indicted on five criminal counts for her alleged role in a fraud and money laundering scheme that purportedly funneled millions of dollars of proceeds from victims in the United States to criminal associates in Nigeria. She appeals from the district court's order affirming the magistrate judge's pretrial detention order. Exercising jurisdiction pursuant to 18 U.S.C. § 3145(c) and 28 U.S.C. § 1291, we affirm.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

I

Odeyale is a citizen of Nigeria.  In March 2016, she came to the United States on a B2 visa.  Less than a month later, she married a United States citizen.[1]  She thereafter applied for permanent resident status based on this marriage and claimed she had divorced her Nigerian husband in December 2015.  In June 2017, Odeyale was granted conditional permanent resident status.

In May 2019, Odeyale filed a petition to remove the conditions on her status.  That petition was denied on the grounds that the divorce papers she provided in support of her petition were not genuine and that her sworn representations about her divorce were fraudulent.  Odeyale unsuccessfully appealed the denial of her petition.

Odeyale's U.S. husband died in December 2020.  Following his death, Odeyale filed a new form I-485 and an application for permanent residence based upon a deceased spouse's citizenship.  In June 2022, she received notice that her application would be denied on the grounds that the Nigerian divorce decree she submitted was fraudulent and that she had married her U.S. husband in order to circumvent United States immigration laws.  No final decision, however, has been issued.

---

[1] According to the government, in July 2018, Odeyale engaged in electronic communications evidencing her apparent involvement in marriage and visa fraud. Those messages, the government asserts, suggest that Odeyale's marriage to the U.S. citizen was arranged for a fee and was fraudulent.

Odeyale currently owns a house with a mortgage in Dallas, Texas, and, prior to these criminal proceedings, lived there with her two minor children.[2]  Odeyale also has a serious boyfriend who lives in the Dallas area.

## II

In early 2024, a federal grand jury in the District of Utah returned a seventeen count indictment against Odeyale and six codefendants.  The indictment alleged that Odeyale and her codefendants "participated in a conspiracy to facilitate so-called romance scams and other advance fee frauds operated online, involving approximately $8 million of losses to victims around the United States and the world."  Aplt. App. vol. I at 39.  According to the indictment, a group of individuals known as "Yahoo boys," most or all of whom were located in Nigeria, operated so-called romance scams and preyed upon victims, mostly elderly women, in the United States.  *Id.* at 40.  A separate group of individuals known as the "Utah Money Transmitters," all of whom were located in the District of Utah, agreed to help the Yahoo boys launder the proceeds of their romance scams.  *Id.* at 39.  Odeyale allegedly assisted the Utah Money Transmitters in laundering the proceeds.  Odeyale worked at Ping Express, an unlicensed money transmission business located in Texas and formed by her brother.  The ultimate goal of "the money laundering activities," according to the indictment, "[wa]s to transmit the criminal proceeds to

---

[2] Odeyale and her U.S. husband had no children.  Odeyale's oldest child was born in Nigeria prior to Odeyale's arrival in the United States.  The record is unclear as to where Odeyale's youngest child was born.

3

the Yahoo boys overseas, while paying a share of the ill-gotten gains to those who help[ed] move the funds along the way," including Odeyale. *Id.* at 41.

The indictment charged Odeyale with one count of wire fraud, in violation of 18 U.S.C. § 1343, one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), two counts of money laundering, in violation of 18 U.S.C. § 1957, and one count of aiding and abetting an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960.

After Odeyale was charged in this case, the Bureau of Immigration and Customs Enforcement (ICE) in the Department of Homeland Security issued an immigration detainer for Odeyale and a warrant for her arrest. The detainer alleged that probable cause existed that Odeyale was a removable alien.

Following Odeyale's arrest, the government filed a motion for pretrial detention. Odeyale appeared with counsel before a magistrate judge in the Northern District of Texas for a detention hearing. The government presented testimony from a special agent with the Federal Bureau of Investigation (FBI) who testified, based on his conversations with an ICE agent and ICE attorney, about Odeyale's immigration status. At the conclusion of the agent's testimony, the magistrate judge stated on the record that she was "very, very concerned that . . . Odeyale represented to Pretrial Services and to [defense counsel] that she had legal status to be" in the United States, when in fact "she ha[d] been turned down for that legal status." Aplt. App. vol. I at 92.

4

After considering the evidence, the magistrate judge found that Odeyale presented a serious risk of flight and that, consequently, the case was "eligible for consideration of detention based on" that risk. *Id.* at 98. The magistrate judge emphasized that her finding included consideration of "the nature of the indicted charges, the allegations of . . . Odeyale's significant role in the offense, the substantial weight of the evidence" against Odeyale, "the lack of [her] ties to the prosecuting district, and [the fact] that . . . Odeyale face[d] a significant term of imprisonment if . . . convicted in this case as well as deportation." *Id.* at 99. The magistrate judge in turn found, for essentially the same reasons, that there was no condition or combination of conditions that would assure Odeyale's appearance in court.

Odeyale was moved to the District of Utah. There, she appealed and moved to revoke the detention order issued by the magistrate judge in the Northern District of Texas. Odeyale alleged in support that "on or around August 7, 2023," she "received a I-551 Temporary Evidence Stamp on her passport" that "provides 'Upon endorsement, serves as a temporary I-551 evidencing permanent residency for one year.'" *Id.* at 61 (internal quotation marks omitted). Odeyale argued that "it appear[ed] that [she] currently ha[d] permission to be in the United States through the filing of her I-751 petition and the receipt of the I-551 stamp." *Id.* at 71. She also argued that the magistrate judge erred in failing to give adequate weight to evidence of her "non-risk of flight," which, she asserted, included the fact that her "two children . . . reside[d] in the United States," the fact that she owned a home with a

mortgage in the Dallas area, and the fact she had a boyfriend who also resided in the Dallas area. *Id.* at 70.

On April 5, 2024, the district court held a hearing on Odeyale's appeal and motion to revoke the detention order. The district court found at the outset that the I-551 stamp in Odeyale's passport "reflect[ed] the fact that her application for adjustment [of] status technically remain[ed] pending, but" did "not confer status and on its face expire[d] on August 6, 2024." *Id.* vol. II at 292. Focusing on the legal requirements for detention, the district court questioned government counsel about whether the potential flight risk could be managed by, for example, the use of an ankle monitor and having Odeyale surrender her passport. Government counsel responded that the evidence in the case indicated that Odeyale's coconspirators "had access to unused fake passports" and "[s]o if she wanted to leave the country, she has known associates who could procure a fake passport for her." *Id.* at 306.

At the conclusion of the hearing, the district court found that both steps of the detention inquiry were satisfied. With respect to the first step, the district court found there was a serious risk that Odeyale would flee. The district court cited a number of factors in support of this finding: (a) that Odeyale faced substantial penalties if convicted in the case; (b) the evidence against her appeared to be strong; (c) she had significant ties to Nigeria; (d) she controlled bank accounts and had significant financial resources; (d) she had a significant network of contacts and associates in Nigeria; (e) she had no lawful ties to the District of Utah; (f) it was "extremely unlikely that she ha[d] any meaningful longterm prospects" in the United

6

States and she "accordingly ha[d] little incentive to remain in the United States to face a potentially significant prison term only to be deported afterwards"; and (g) there was no evident reason why she would not be able to take her children with her to Nigeria. *Id.* at 317–18. As for the second step of the detention inquiry, the district court found by a preponderance of the evidence that there was no condition or combination of conditions that would reasonably assure Odeyale's appearance in court. The district court also cited a number of factors in support of this finding: (a) that Odeyale posed a serious flight risk; (b) her immigration history and alleged criminal activity "evince[d] a willingness to flout legal rules and authority for personal gain"; (c) the evidence demonstrated "Odeyale's ability to evade detection of her unlawful activities through sophisticated means"; (d) she had "a track record of procuring and submitting fraudulent official documents to the government and the government represent[ed] that her associates ha[d] proved able to obtain and willing to use false passports"; and (e) she had "demonstrated her ability to surreptitiously transfer large quantities of money from the United States to Nigeria." *Id.* at 319. In light of all these factors, the district court found "little reason to believe that . . . Odeyale w[ould] comply with any conditions" imposed on her "and every reason to believe that" she would attempt to evade those conditions and would do so "through deceitful and sophisticated means that" had "a high likelihood of succeeding." *Id.* at 319–20. Based on its findings, the district court denied Odeyale's appeal and motion for revocation of the magistrate judge's order of detention pending trial.

Odeyale now appeals the district court's decision.

7

III

A

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Consistent with this principle, the Bail Reform Act (the Act), permits pretrial detention of arrestees but provides that individuals charged with a crime are generally "released on personal recognizance or upon execution of an unsecured appearance bond," 18 U.S.C. § 3142(a)(1), or they may be "released on a condition or combination of conditions" that will reasonably ensure their appearance in court and the safety of the community. *Id.* § 3142(a)(2), (c)(1).

"The Act establishes a two-step process for detaining an individual before trial." *United States v. Ailon-Ailon*, 875 F.3d 1334, 1336 (10th Cir. 2017). First, the government may move for pre-trial detention of the defendant if the case involves "certain enumerated offenses" or if the case "'involves . . . a serious risk that such person will flee; or . . . a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.'" *Id.* (quoting § 3142(f)). Second, if the district court determines that the case involves one of the serious risks outlined in § 3142(f), the government must prove "that there 'is no condition or combination of conditions' that 'will reasonably assure the [defendant's] appearance . . . as required [as well as] the safety of any other person and the community.'" *Id.* (quoting § 3142(f)). In deciding whether the government has met its burden of proof, the

district court is required to consider several factors, including "'the nature and circumstances of the offense charged,' 'the weight of the evidence against the person,' 'the history and characteristics of the person,' and 'the nature and seriousness of the danger to any person or the community that would be posed by the person's release.'" *Id.* at 1336–37 (quoting § 3142(g)).

"We apply de novo review to mixed questions of law and fact concerning the detention or release decision, but we accept the district court's findings of historical fact which support that decision unless they are clearly erroneous." *Id.* at 1337 (internal quotation marks omitted).

B

Odeyale makes two arguments on appeal. First, she argues that the district court erred in finding that she presented a serious risk of flight. Second, she argues that the district court erred by finding that no conditions existed that could reasonably assure her appearance in court. For the reasons that follow, we reject both of these arguments and affirm the district court's decision.

In challenging the district court's finding that she presented a serious risk of flight, Odeyale begins by arguing that the "district court's focus on" her "immigration status, as it pertained to flight risk, was misplaced." Aplt. Br. at 12. Although Odeyale acknowledges there is an ICE detainer in place, she argues "it is well established in this Circuit that a risk of involuntary removal does not establish a serious risk that" the defendant "will flee." *Id.* (internal quotation marks omitted). She argues that the district court essentially ignored this authority and found that her

9

"risk of involuntary removal was a significant factor for pretrial detention." *Id.* at 13. In particular, she asserts that the district court found that her "lack of 'future prospects' in light of her likely involuntary removal cut against any possible ties to the United States." *Id.* (quoting Aplt. App. vol. II at 317). She argues, however, that the "denial of lawful immigration status and resulting removal are not foregone conclusions" in her case because she has "an I-551 stamp in [her] passport." *Id.* at 14.

We reject these arguments. The district court expressly acknowledged that Tenth Circuit authority prohibited it from finding "someone is a flight risk just based on the fact that if they're released, they'll be deported." Aplt. App. vol. II at 311. Thus, the district court did not ignore binding Tenth Circuit authority in making its finding that Odeyale posed a serious risk of flight. *See Ailon-Ailon*, 875 F.3d at 1337 (holding that a risk of involuntary removal does not, standing alone, establish a serious risk that the defendant will flee). To be sure, the district court did take into account the likelihood of Odeyale being deported in assessing her ties to the United States. But there is no prohibition on that. Indeed, § 3142(g)(3)(A) requires a district court to consider "the history and characteristics of the person, including . . . the person's . . . community ties." 18 U.S.C. § 3142(g)(3)(A). Lastly, the district court found, and Odeyale does not seriously dispute, that the I-551 stamp in her passport merely "reflects the fact that her application for adjustment [of] status technically remains pending, but it does not confer status and on its face expires on August 6, 2024." Aplt. App. vol. II at 292.

Odeyale also argues, regarding the district court's finding that she presented a serious risk of flight, that the "district court too easily disregarded" her "proffered ties to the U.S." Aplt. Br. at 16. She notes that she represented at the hearing that her youngest child was a United States citizen and the government failed to refute her representation. She also asserts there "was an insufficient basis in the record to find that" her "youngest child's father was a Nigerian citizen." *Id.* at 17. Odeyale also asserts that she has lived in Texas since early 2016, her two minor children live with her, she speaks English fluently, and has not been to Nigeria "in some time." *Id.* at 19.

We again reject Odeyale's arguments. In analyzing the § 3142(g) factors, the district court expressly considered Odeyale's family and community ties, but did not find them sufficient to outweigh the other statutory factors, including, for example, the nature of the pending criminal charges and the weight of the evidence against her. We conclude the district court did not commit clear error in this regard.

That leaves Odeyale's challenge to the district court's finding that no condition or combination of conditions would reasonably assure her appearance in court. She argues that she "has no criminal history nor a proven history of violating judicial orders." Aplt. Br. at 20. Odeyale does not dispute that her prior petitions to adjust her immigration status contained misstatements, but she asserts that such evidence "does not prove, by itself, that [she] would willfully disregard conditions of release." *Id.* at 21. She also argues that her alleged involvement in the underlying criminal activity should not have been considered because "[v]iolating legal rules is

11

inherent in every criminal prosecution and she is presumed innocent until convicted." *Id.* Lastly, she argues that the district court erred in disregarding the viability of ankle monitors and surrendering her passport, and effectively required her to prove that those measures, or other measures, would guarantee her compliance.

We find no merit to these arguments. A defendant's criminal history is but one of the statutory factors that a district court must consider in determining whether there are conditions of release that will reasonably assure the defendant's appearance. Although Odeyale's apparent lack of criminal history weighs in her favor, it was not sufficient to override the weight of the other statutory factors that the district court considered. As for Odeyale's prior misstatements in her immigration petitions, that was without question a proper factor for the district court to consider, particularly because it was relevant to her "character" and "past conduct." 18 U.S.C. § 3142(g)(3)(A). Odeyale's assertion that the district court should not have considered her alleged involvement in the underlying criminal activity is simply wrong; § 3142(g)(1) required the district court to consider it. Finally, the district court did not disregard the possibility of using ankle monitors or having Odeyale surrender her passport, but rather found that those measures were insufficient. In particular, the district court noted that ankle monitors are "not foolproof" and that it had "see[n] a lot of cases where they're removed" by defendants. Aplt. App. vol. II at 306, 320. The district court also found there was a likelihood that Odeyale could procure a fake passport, either on her own or with help from her criminal associates. In sum, we conclude the district court did not err in determining there was no

12

condition or combination of conditions of release that would reasonably assure

Odeyale's appearance in court.

IV

We affirm the district court's detention order.

Entered for the Court

Per Curiam

*24-4042, United States v. Odeyale*
Judge Federico concurring

Although I join the majority's per curiam order to affirm the district court's detention order, I write separately concerning two points. First, this order should not be read to dilute or unnecessarily confuse our precedent holding that the risk of *involuntary* immigration removal has no bearing on a district court's consideration of whether there is a "serious risk that [the defendant] will flee" under 18 U.S.C. § 3142(f)(2)(A). Second, the district court noted the defendant "had no lawful ties to the District of Utah." Aplt. App'x I at 317-18. However, in my view this was an erroneous interpretation of the word "community" in the Bail Reform Act, 18 U.S.C. § 3141 *et. seq.*, because it too narrowly construes the definition of "community" to solely encompass the charging district.

In *United States v. Ailon-Ailon*, we said, "a risk of involuntary removal does not establish a 'serious risk that [the defendant] will flee' upon which pre-trial detention may be based." 875 F.3d 1334, 1337 (10th Cir. 2017) (quoting § 3142(f)(2)(A)). The defendant correctly argues this precedent makes it "well established in this Circuit that a risk of involuntary removal does not establish a serious risk that [the defendant] will flee." Aplt. Br. at 12.

The district court cited *Ailon-Ailon* and deftly sought to navigate its holding. However, in our affirmance, our order says there is no prohibition

1

against a district court considering the likelihood of deportation because the statute requires consideration of a defendant's community ties. But as we established in *Ailon-Ailon*, "the plain meaning of 'flee' refers to a volitional act rather than involuntary removal." 875 F.3d at 1335. The likelihood that a person may be involuntarily removed from the country has nothing to do with her community ties. Whereas a comprehensive assessment of each individual's circumstances is required to decide whether to detain or release a defendant, which *may* generally include a person's immigration status (and, here, the evidence the defendant has on several occasions presented fraudulent documents as part of her immigration proceedings), we should be cautious to hold the line as we did in *Ailon-Ailon* that a risk of involuntary removal does not, in itself, create a serious risk that a defendant will flee to avoid prosecution.

This point is further evident because a district court considers "community ties" only if it reaches the second step of the "two-step process," or "whether there are conditions of release that will reasonably assure the appearance of the person as required." *Id.* at 1336-37 (quoting § 3142(f)). It is at step one, however, that a district court determines whether the government can establish a "serious risk that [the defendant] will flee." *Id* at 1336. Thus, today's opinion should not be read to conflate steps one and two of the "two-step process for detaining an individual before trial." *Id.*

2

Second, and speaking of community ties, the defendant was arrested in the Northern District of Texas, where she resides with her two minor children, is self-employed, owns a home with a mortgage, and has a serious boyfriend. Aplt. App'x I at 70. It is certainly common enough that a defendant is indicted in one federal district but arrested and/or resides in another district. *See* Fed. R. Crim. P. 5(c)(3) (explaining procedure for initial appearance when a defendant is arrested in a district other than where the offense was allegedly committed). And when that happens, the defendant often seeks release to where they live, not where they are charged and must appear in court.

From the record, the district court considered the defendant's community ties to the District of Utah – the venue for the criminal proceeding initiated against her by the filing of the indictment. That consideration and finding were an overly narrow interpretation of the statute. The term "community" is not defined in the statute, but it is certainly broader than the district of the charges.

The record indicates the defendant sought release to Texas, not Utah, so that is the "community" the district court should have evaluated the strength of her ties (which were many). *See United States v. Santos-Flores*, 794 F.3d 1088, 1093 (9th Cir. 2015) ("'[C]ommunity ties' under the Bail Reform Act 'embrace[ ] both the community in which the charges are brought and also a community in the United States to which the defendant has ties.'" (citations

3

omitted)). So, while I agree with and affirm the district court's detention order, I set aside the district court's finding that the defendant's lack of community ties to Utah was a significant factor to merit detention.

4